IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MOSAID TECHNOLOGIES INC.,

     Plaintiff,

v.

ADOBE SYSTEMS, INC., ALCATEL-
LUCENT USA, INC., INTERNATIONAL
BUSINESS MACHINES CORP, JUNIPER
NETWORKS, INC., NETAPP, INC., RED
HAT, INC., AND VMWARE, INC.

     Defendants.

C.A. No.: 11-698-GMS

JURY TRIAL DEMANDED

---

**PLAINTIFF'S RESPONSE TO VMWARE'S
MOTION TO DISMISS FOR LACK OF STANDING**

---

January 19, 2012

OF COUNSEL:

Steven G. Hill
Douglas R. Kertscher
HILL, KERTSCHER & WHARTON, LLP
3350 Riverwood Parkway, Suite 800
Atlanta, Georgia  30339
770.953.0995

BAYARD, P.A.

Richard D. Kirk (rk0922)
Stephen B. Brauerman (sb4952)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899
rkirk@bayardlaw.com
sbrauerman@bayardlaw.com
(302) 655-5000

*Attorneys for Plaintiff MOSAID
Technologies Inc.*

## TABLE OF CONTENTS

I.   NATURE AND STAGE OF PROCEEDINGS ................................................. 1

II.  SUMMARY OF ARGUMENT ................................................................ 1

III. STATEMENT OF FACTS ..................................................................... 4

      a.    Pitts and the Auspex Agreement "for use with Auspex Products" ........................ 4

      b.    Prior Patent Litigation and Judge Walker's Ruling Regarding Inca ...................... 7

      c.    Auspex's Bankrutpcy Filing and Description of its Assets .................................. 9

IV.  ARGUMENT AND CITATION OF AUTHORITY ........................................ 10

      A.    Legal Standard ................................................................................ 10

      B.    The Prior Agreements Afford  Limited Product Licenses That Do Not Deprive MOSAID of Standing to Sue. ................................................... 11

      C.    Auspex, Inca and NetApp are Not Necessary Parties ................................... 17

V.   CONCLUSION ............................................................................... 19

# TABLE OF AUTHORITIES

## Federal Cases

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 726 F. Supp. 2d 459, 462 (D. Del. 2010) (Farnan, J.) .................................................................................................................12

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, 630 F. Supp. 2d 365, 371 (D. Del. 2007) (Farnan, J.) ......................................................................................... 14

*Field v. Volkswagenwerk AG,* 626 F.2d 293, 300 (3d Cir. 1980) ................................. 18

*Jurimex Kommerz Transit G.M.B.H. v. Case Corp.,* 65 Fed.Appx. 803, 805 (3d Cir. 2003) ....... 17

*Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 899 (3d Cir.1987) ....................................11

*Prima Tek II, L.L.C. v. A-Roo Co.,* 222 F.3d 1372, 1378-79 (Fed. Cir. 2000) ............................ 11

*Propat Intern. Corp. v. Rpost, Inc.*, 473 F.3d 1187 (Fed. 2007)...................................................... 15

*Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, C.A. No. 07-255-JJF, 2008 U.S. Dist. LEXIS 98178 *7 (D. Del. Aug. 26, 2008) (Jordan, J.) .............................................................. 15

*Sicom Sys. Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971, 979 (Fed. Cir. 2005) ............................... 13

*St. Clair IP Consultants, Inc.v. Palm, Inc.*, 2009 WL 1220546, *8, 10 (D.Del. 2009)(Stark, J.)........................................................................................................................ 13

## Federal Statutes

Fed. R. Civ. P. 12(b)(1)......................................................................................................... 1

Fed. R. Civ. P. 12(b)(7)..................................................................................................... 1, 17

Fed. R. Civ. P. 19 .............................................................................................................. 19

Fed.R.Civ.P. 19(a) .......................................................................................................... 17, 18

Fed.R.Civ.P. 19(b) .......................................................................................................... 17, 18

## I.    NATURE AND STAGE OF PROCEEDINGS

Plaintiff MOSAID Technologies Inc. ("Plaintiff") has properly filed a First Amended Complaint accusing each of the Defendants Adobe Systems, Inc. ("Adobe"), Alcatel Lucent USA Inc., ("Alcatel"), International Business Machines Corp. ("IBM"), Juniper Networks, Inc. ("Juniper"), Red Hat Inc. ("Red Hat") and VMware, Inc. ("VMware" and collectively with Adobe, Alcatel, IBM, Juniper, and Red Hat, "Defendants") of infringing U.S. Patent No. 5,892,914 (the "'914 Patent").

Only Defendant VMware filed a motion to dismiss for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1) and alleges there are other necessary parties who should be joined pursuant to Fed. R. Civ. P. 12(b)(7).  (D.I. 45).  The present filing focuses on the unique issues raised in the motion to dismiss for lack of standing or for joinder of necessary parties.

## II.    SUMMARY OF ARGUMENT

Plaintiff alleges in its First Amended Complaint that it is the "owner…of all right, title and interest in the '914 patent."  (D.I. 16 at ¶ 21).  VMware's motion constitutes a factual attack, as opposed to a facial attack, on Plaintiff's standing pursuant to Fed. R. Civ. P. 12(b)(1) and is based primarily on two licenses granted prior to MOSAID's acquisition of the '914 Patent: a 1994 license between William Pitts ("Pitts"), the inventor of the '914 Patent, and Auspex Systems, Inc. ("Auspex") and a 1996 license between Pitts and Inca Technology, Inc. ("Inca").

VMware's motion is notable for what it does not say.  VMware's legal team represented a prior defendant faced with infringement of the same patent rights.  VMware's legal team asserted in that prior case that the Pitts-Inca license deprived the former owner of the Pitts' patents of standing to sue.  The District Court in the prior case looked at the plain language of the

Inca agreement and held that there was no standing problem because Inca's license scope <u>was limited to a specific field of use</u>.

Although VMware now adds further reference to a second product license agreement with Auspex from 1994, that agreement is of no moment for the very same reason -- on its face, the Auspex agreement <u>is limited to a specific field of use</u> restricted for use only with "Auspex products," which is even narrower than the field of use restriction in the Inca agreement that a prior court found utterly inadequate to deprive the patent owner of standing to sue for infringement.

VMware does not submit the portions of Pitts' deposition testimony (which was solicited by VMware's legal team) where he clearly describes the language and the intention of the Auspex agreement as limited by this specific field of use.

VMware's contention that Pitts transferred "substantially all" of his patent ownership rights via the Auspex agreement is contrary to:

- the plain language of the license portion of the agreement, which merely transfers Pitts' intellectual property ("IP") within a very narrow field of use, namely "with Auspex Products." (Ex. A, pg. 1);

- the plain language of the entire agreement. Defendant's interpretation of the license portion of the agreement would render Sections 6.0 – 6.2 of the agreement superfluous. Defendant's interpretation also ignores Sections 3.2-4.2, which only compensate Pitts for sales employing his IP in the narrow field of use "with Auspex Products."

- the missing language not in the agreement, e.g., the agreement is silent on and does not transfer to Auspex the right to sue others for infringement or even the

right to exclude Pitts from practicing his invention, nor does it transfer substantially all the rights necessary or standard for a patent license agreement, namely, the right to make, have made, import, use of offer for sale products practicing the patents, but rather grants strictly a license "to distribute and authorize others to distribute;"

- the post-agreement conduct of the parties, because in 2003, Auspex did not claim to own any substantial interest in any of Pitts' patents in its filings with either the Bankruptcy Court[1] or the Securities and Exchange Commission ("SEC"), and never otherwise contended to Pitts that it owned "substantially all" of Pitts' patent rights; and

- Judge Walker's (Northern District of California) prior 2002 order, which denied a motion to dismiss for lack of standing brought in 2002 by VMware's present legal team, and which was based upon an even broader license to Inca than the Auspex license presently asserted by Defendant VMware.

VMware's motion for joinder of three separate corporations (Auspex, Inca, and Network Appliances, Inc. ("NetApp")) does not satisfy Rule 19's definition of a necessary party because NetApp did not purchase any of Pitts' patents from Auspex in bankruptcy (which listed no ownership of any interest in any of Pitts' patents) and because Plaintiff's allegations of infringement do not implicate the narrow scope of licenses granted to Auspex (use with "Auspex products") and Inca (use in the "File System Field"). Thus, VMware's motion is meritless and should be denied.

---

[1] Auspex filed bankruptcy in the Northern District of California in April 2003, case number 03-52596-MM11.

3

### III.    STATEMENT OF FACTS

#### a.    Pitts and the Auspex Agreement "for use with Auspex Products"

After working for Auspex for three years, William Pitts left Auspex in 1990.  After leaving Auspex, Pitts conceived of the subject matter that were ultimately reflected in the June 1992 Patent application, a Patent Cooperation Treaty Application with the USPTO, No. PCT/US92/04939 (the "PCT Application").    (Pitts Decl., ¶ 2, filed contemporaneously herewith).  The core principles of this application for letters patent applied to having network nodes (multiple machines), each having their own cache and processing, as well as the ability to communicate upstream and downstream with each other to locate a requested item of data in a memory cache or, if necessary, in the original file.  (Pitts Decl., ¶ 2).

Later in 1992, Pitts had discussions with Auspex wherein they suggested that Pitts would return to work for them and assign them all of his IP in exchange for a certain amount of Auspex stock.  However, Pitts and Auspex were not able to reach any agreement on this and did not speak again until 1994.  (Pitts Decl., ¶ 3).

In 1994, Auspex and Pitts reached a "more limited agreement," (Pitts Decl., ¶ 4), the May 5, 1994 Auspex/Pitts Agreement. (Ex. A).  At the time of this more limited agreement, no claims of any of the Pitts patents had issued.  (Pitts Decl., ¶ 15).

The patent's earliest claims were not allowed until several years later.  (Pitts Decl., ¶ 15).  Thus, it was not known at the time of the Auspex agreement what the scope of any future patent claims (claims defining the legal scope of any actual patent rights) would be.   (Pitts Decl., ¶ 15).

The operative field of use language pertinent to any exclusive rights conferred by the "more limited" Auspex  agreement reads as follows (in pertinent part):

> Pitts hereby grants to Auspex, under all applicable patents, copyrights, and other Intellectual Property Rights owned by Pitts or licensed to Pitts, an irrevocable, perpetual,

4

> exclusive, worldwide, royalty-bearing license with the right to sublicense, **to distribute and authorize others to distribute**...**the Product**…**for use with Auspex products** with all ancillary rights necessary to accomplish such sale or distribution, and including the right to prepare or have prepared derivative works based on the product.

(Ex. A, p. 1, Sect. 2.0 (emphasis added)).  This agreement is a product license agreement with exclusivity in a very narrow field of use.  (Pitts Decl., ¶ 5; Pitts Depo., p. 81, 266-68, attached as Ex. B).

The agreement specifically states in Section 2.0 that the rights conferred are rights restricted by field of use to the "Product … for use with Auspex products."  (Ex. A, p. 1; Pitts Depo., p. 81, 266-68; Pitts Decl., ¶ 5).  By the agreement, Pitts' intended to give specific product and adjacent IP rights to Auspex with a restrictive field of use (limited to use with Auspex products) to help Auspex enhance the desirability of its products, namely, Auspex servers (boxes).  (Pitts Depo., p. 81, 248-49, 258, 262, 272; Pitts Decl., ¶ 6).  "The word exclusive was used is because it was constrained for use within Auspex products or in conjunction with Auspex products."  (Pitts Depo., p. 278).

Consistent with this language, Pitts' recollection and understanding of the agreement is that he gave Auspex the exclusive rights, including IP rights, to his source code (Product) for use with the Auspex box, to incorporate it into the box, and to sell the box (and to sublicense my code to customers as might be necessary) for use with the Auspex box.  (Pitts Depo., p. 63-64; Pitts Decl., ¶ 6).

Pitts did not intend to nor did he actually license to Auspex, either exclusively or non-exclusively, any IP rights outside the limited field of Auspex product-specific use, as described in the agreement.  (Pitts Decl., ¶ 9).  Additionally, the agreement gave Auspex no right to sublicense any patent rights to third parties except to the extent, per Section 2.0 of the agreement, the third parties were customers and the sublicense pertained to using my work product "with

5

<u>Auspex products</u>" (i.e., an Auspex server).  (Pitts Decl., ¶ 13).  In fact, the agreement does not in any way explicitly authorize Auspex to make products under Pitts' patents or even to use them, a fundamental part of any actual patent license grant.  (Ex. A).

   In terms of products or code or inventions for use with anything other than the Auspex box, Pitts gave Auspex <u>nothing</u>.  (Pitts Decl., ¶ 8).

The Auspex agreement describes the compensation that Pitts was to have been paid. Section 3.2 – 3.4 describe that Pitts was to be paid royalties only for actual Auspex sales made when the Pitts software was "bundled with an Auspex file server…" or "sold to the existing Auspex installed base or as a separately priced invoice line item with new file servers." (Ex. A, p. 2).   Consistent with this, Pitts understood that "Auspex was to have paid [him] a royalty on every Auspex box sold (none were) which utilized [his] source code."  (Pitts Decl., ¶ 7).

The Auspex agreement, in section 4.1-4.2, called for Pitts to implement the software "within the standard system software of the standard Auspex file server" and for Auspex to provide Pitts with "a standard Auspex file server in the Auspex facilities."  (Ex. A, p. 2). Sections 3.2 through 4.2, reflected that Pitts was to receive royalties based upon sales to Auspex customers.  (Pitts Depo., P. 243; Pitts Decl., ¶ 8).

The agreement is silent on compensation to Pitts in the event of any other type of IP licensing or usage (other than usage with Auspex products), and  Pitts  "never would have agreed to permit Auspex to enforce any of [his] IP rights, including [his] patent rights, or to otherwise collect license fees from persons <u>other than persons using Auspex products</u>."  (Pitts Decl., ¶ 9 (emphasis added)).   In the agreement, there are <u>no provisions</u> contemplating any licensing of any product or patent rights to any person other than an Auspex customer using Auspex products.  (Ex. A; Pitts Decl, ¶ 9 (emphasis added)).

Since the Auspex agreement is silent with respect to any royalties owed to Pitts in the event of a license fee paid to any third party using any of his IP for products other than Auspex products, VMware's interpretation of the agreement requires the Court to conclude that Pitts wanted royalties for use of his IP with Auspex products, but was content to let Auspex have his IP rights for free as to the vast majority of the marketplace that was <u>not</u> using Auspex products. (Pitts Decl, ¶ 9).  Pitts did not agree and would never have agreed to such a one-sided arrangement.  (Pitts Decl, ¶ 9).

The Auspex agreement, in sections 6.0-6.2, contained a section called "Ownership of IP Related to a Derivative Works and Auspex Funded Development."  (Ex. A, p. 3).  In section 6.1, the parties agreed that "Derivative works of the Product developed by or on behalf of Auspex shall be the sole and exclusive property of Auspex."  (Ex. A, p. 3).  In Section 6.2, the parties agreed that "[w]henever Auspex funds Pitts' development of a new feature, product, etc…Auspex will own the resulting Funded Development, including all patent, copyright, trade secret and all other [IP] rights arising therefrom."  (Ex. A, p. 3).  The parties, in inserting these paragraphs, clearly agreed that this statement of additional assignment of rights to Auspex was necessary, notwithstanding the previously-stated license grant in Section 2.0.  (Ex. A, p. 1).

After the May 5, 1994 agreement, Pitts worked with Auspex for approximately sixty (60) days to develop prototype software as requested.  (Pitts Decl, ¶ 14).  Pitts demonstrated this software to Auspex, but did not give it to Auspex.  (Pitts Decl, ¶ 14).  After that, Auspex never made further inquiry into Pitts' patent application(s), patents or other IP rights.  (Pitts Decl, ¶ 14).  Pitts did not consider the Auspex agreement in effect or relevant.  (Pitts Depo, p. 314).

### b.   <u>*Prior Patent Litigation and Judge Walker's Ruling Regarding Inca*</u>

In October 1996 (after the foregoing limited product distribution license to Auspex), Pitts

granted an "exclusive license of the '049, the '914 and the '452 patents to Inca, including the right to sublicense the patents."  (Walker, J., Order of August 13, 2002, p. 3, attached as Ex. C).

Subsequently, in April 2001, Inca, Network Caching Technology LLC ("NCT") and Pitts entered into an agreement which <u>cancelled</u> the prior agreement between the parties and assigned all interest in the relevant patents (including the '914 patent) from Pitts to NCT.  (Ex. C, p. 3; D.I. 47, Declaration of Monte M.F. Cooper in Support of Defendant VMWare, Inc's Motion to Dismiss for Lack of Jurisdiction over the Subject Matter, Ex. F, *hereinafter* "Cooper Decl.")).  Under this agreement, Inca retained only limited rights with respect to the patents at issue.[2]  (Ex. C, p. 3).

Inca was granted a nonexclusive license in the "File System Field," the right within this limited field of use to sublicense its proprietary products to others, the right of approval over any license NCT might grant in this narrow field, and finally the right to sue separately in this narrow field.  (Ex. C, p. 3).  In this agreement, there was no mention of Auspex or any prior transfer. (Cooper Decl., Ex. D).

Notably, and as held by Judge Walker, this license stated that "[t]he File System Field **<u>excludes</u>** the HTTP, FTP, TFTP and/or Gopher protocols."  (Cooper Decl., ¶ 3, p. 3 (emphasis added)).  In the present case, the accused products operate according to the HTTP protocol and other protocols that are **<u>not</u>** in the File System Field.  Importantly, VMware has not offered any evidence that its accused products fit within the File System Field so as to implicate the Inca agreement.

---

[2] Contrary to VMware's assertions about Inca's right to sublicense, Inca only received a right to sublicense patents "in connection with the sale or other transfer of Inca's proprietary products and/or systems." (Cooper Decl. Ex. F, Section A (3))

Later in 2001, NCT brought litigation in the Northern District of California, alleging infringement against six (6) different Defendants. One Defendant was Inktomi Corp. ("Inktomi"), which was represented by the same legal team that is now representing VMware. In 2002, Inktomi moved to dismiss NCT's complaint based upon lack of standing, contending that "NCT does not retain sufficient rights under the 2001 agreement in the patents at issue to have standing to sue." (Ex. C, p. 4).

Judge Walker <u>denied</u> Inktomi's motion. (Ex. C). After quoting Pitts' assignment agreement to NCT (Cooper Decl., Ex. F, ¶ 1) and Inca's assignment agreement to NCT (Cooper Decl., Ex. E, ¶ 2), Judge Walker held that "[b]y the plain language of the agreement, NCT now holds the title to the patents at issue…the agreement is specific that all interests in the patents are assigned to NCT and in return, NCT provides a license to Inca <u>limited to the file system field</u>. As the title holder of the patents at issue, NCT has standing to sue in this action." (Ex. C, p. 5). In 2003, NCT reached a settlement with all parties, including Inktomi, and no party ever appealed Judge Walker's order.[3]

Later, on April 7, 2009, NCT assigned all of its patent rights to Twister Investments, LLC. (Ex. E). Finally, on April 26, 2011, Twister Investments, LLC assigned all of its patent rights in these patents to Plaintiff MOSAID Technologies, conferring standing upon MOSAID to bring this suit. (Ex. E). VMware does not contend that these agreements deprive MOSAID of standing to bring this suit.

### c. *Auspex's Bankrutpcy Filing and Description of its Assets*

In April 2003, during the pendency of the NCT-Inktomi patent litigation, Auspex filed for bankruptcy in the Northern District of California. As part of this filing, on April 22, 2003,

---

[3] Defendant VMware does not mention Judge Walker's order in its brief, and *a fortiori*, does not contend that Judge Walker committed error in any way in his order.

Auspex filed with the Bankruptcy Court "A Description of Auspex Systems, Inc. IP Inclusive of Software, Hardware Platform, Patents and Assignable Licenses." (Ex. F). This twenty-eight (28) page document makes no claim to ownership of any of the Pitts patents, including the '914 patent. (Ex. F). It also makes no claim to ownership of any interest in the outcome of the prior NCT patent litigation which was pending at the time. (Ex. F).

Despite Auspex's representations to the Bankruptcy Court, VMware nevertheless asserts that Network Appliances, Inc. ("NetApp") purchased Auspex's patent assets out of the Bankruptcy Court. Neither this agreement (Cooper Decl. Ex. E), nor Auspex's June 2003 8K filing with the Securities and Exchange Commission describing this purchase, make any reference to ownership of any interest in any of the Pitts patents, including the '914 patent. (Ex. F).

At no point before, during or after the entry into the May 1994 agreement with Auspex, did anyone from Auspex ever advise Pitts that Auspex believed that it had any right or interest in any of his IP rights outside of the narrow field of use described in Section 2.0, "for use with Auspex products." (Pitts Decl, ¶ 5).

### IV.    ARGUMENT AND CITATION OF AUTHORITY

#### A.  Legal Standard

While the plaintiff bears the burden to prove that jurisdiction does in fact exist, the plaintiff's burden is relatively light, for "dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Kulick v. Pocono Downs*

*Racing Ass'n,* 816 F.2d 895, 899 (3d Cir.1987) *(quoting Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666 (1974)).

### B. The Prior Agreements Afford  Limited Product Licenses That Do Not Deprive MOSAID of Standing to Sue.

In order to deprive the Plaintiff of standing, the 1994 Auspex agreement must have transferred "all substantial rights" in the currently asserted patents.[4]   *Prima Tek II, L.L.C. v. A-Roo Co.,* 222 F.3d 1372, 1378-79 (Fed. Cir. 2000) (holding that patentee did not transfer all substantial rights).   In *Prima Tek II*, the patentee granted the assignee a worldwide license to make, use, and sell products covered by certain patents, but only to the extent necessary to sub-license the right to make, use, and sell the patented products.   *Id.* at 1379.   The Federal Circuit held that this product license did not transfer all substantial patent rights: "[i]n evaluating whether a particular license agreement transfers all substantial rights in a patent to the licensee, we pay particular attention to whether the agreement conveys *in full* the right to exclude others from making, using and selling the patented invention in the exclusive territory."  *Id.* At 1379.

Similarly, the 1994 Auspex agreement was, on its face in Section 2.0, limited as a license only **"to distribute…Products..for use with Auspex products**."   In other words, the parties only intended to transfer to Auspex the exclusive right to combine its products with Pitts' invention and then distribute same to Auspex customers.   There is no language anywhere in the agreement conveying any IP rights outside the limited field of Auspex product-specific use.   *A fortiori*, there is no language anywhere in the agreement conveying in full the right to exclude others from making, using and selling the patented invention outside the limited field of Auspex product-specific use.

---

[4] Since no claims had been issued by the USPTO in May 1994, Pitts could not have known or intended that the specific claims of the '914 or the patents sought to be asserted in the Second Amended Complaint (all of which issued after 1994) be licensed to Auspex in 1994.

The agreement, read as a whole, further supports the conclusion that the parties only intended a limited license only "for use with Auspex products."  Defendant VMware ignores indications spread throughout the Auspex agreement that Pitts did not intend to transfer "all substantial rights" to Auspex in fields of use other than Auspex products.  Agreements, including those purporting to be patent license agreements, should be read in their entirety.  *See Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 726 F. Supp. 2d 459, 462 (D. Del. 2010) (Farnan, J.) (holding that the plaintiff has standing because, "[w]hile this statement appears to be a broad transfer it must be read in the context of Section 1.07, which provides an explicit definition of the term 'Patent Rights.'").

The compensation sections of the Auspex agreement, Sections 3.2-3.4, make clear that Pitts was only to be paid for royalty fees when sales of his software were sold in conjunction with or for use with other Auspex products.  Were VMware's interpretation of the agreement correct, Pitts would have transferred Auspex his entire patent rights (as Defendant VMware contends) without providing for himself any royalties in the event of any licensing of his IP rights to the vast majority of the marketplace that was not using Auspex products.  Pitts was not employed by Auspex and was not receiving significant income from the agreement, and as such, never would have agreed to such a one-sided arrangement. (Pitts Decl, ¶ 9).  Accordingly, reading the compensation sections of 3.2-3.4 together with the license grant of Section 2.0, it is clear that the parties intended (as expressed in Section 2.0) to transfer only a limited license for Auspex's use of his IP rights in conjunction with the distribution of Auspex products.

Similarly, Sections 6.0-6.2 of the agreement support the construction of the agreement exclusively with Auspex products.  Section 6.1 grants ownership to Auspex of derivative works "developed by or on behalf of" Auspex; Section 6.2 makes it clear that Auspex was only going to

own the rights in product developments for which Auspex funded the development.  These are the only portions of the agreement where any ownership interest by Auspex in any intellectual property rights was expressly addressed.   Moreover, if (as VMware contends) Pitts had previously conveyed "all substantial rights" to Auspex in Section 2.0, then Sections 6.1 and 6.2 would be meaningless, if not contradictory, to the rest of the agreement.  Where the Defendant's interpretation of assignment agreement would render portions of the agreement superfluous, courts should reject the proffered interpretation in favor of one that considers the agreement in its entirety. *St. Clair IP Consultants, Inc.v. Palm, Inc.*, 2009 WL 1220546, *8, 10 (D.Del. 2009)(Stark, J.)(denying motion to dismiss for lack of standing).

Sections of 6.0-6.2 only have meaning where Section 2.0 is interpreted to grant only a limited license of the IP "for use with Auspex products."  When read together with the grant of Section 2.0, it is clear that the parties intended (as expressed in Section 2.0) to transfer only a limited license for Auspex's use of his IP rights in conjunction with Auspex products.

Another factor in determining whether Pitts transferred "all substantial rights" is whether the Auspex received the <u>exclusive</u> right to sue for patent infringement.   One of the most important rights in the standing analysis is the exclusive right to sue for patent infringement because this is the means by which a party exercises the right to exclude others from making, using, and selling the claimed invention.  *Sicom Sys. Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971, 979 (Fed. Cir. 2005).  Here, the Auspex agreement does not convey <u>or make any reference</u> to any assignment of Pitts' right to sue for patent infringement of his invention.

In the absence of such express language, the Court should not conclude that Pitts intended such a broad assignment of the right to sue for patent infringement.  This Court has required broad, express language in order to find that the patentee has assigned the "exclusive

13

right to sue for patent infringement." *Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, 630 F. Supp. 2d 365, 371 (D. Del. 2007) (Farnan, J.).   In *Fairchild*, the license agreement at issue granted to the licensee the exclusive right to sue one particular company for patent infringement.   *Id.* at 371.   However, the Court found that this license still did not confer "all substantial rights" because "the right to sue others still resides with [patentee]…Succinctly put, [assignee] is a bare licensee with the right to sue a specific entity.   The Supreme Court has recognized that the attempted assignment of a right to sue a particular entity 'carrie[s] no part of the title to the patent or interest in it and therefore confer[s] no right to sue for damages for infringement of the patent after the execution of the instrument.'" *Id.*   In contrast, the Auspex agreement gave Auspex no express right to sue anyone, and as such cannot be said to have transferred the "exclusive right to sue for patent infringement."

Aware of this problem with its argument, VMware attempts to concoct a broad assignment where one does not otherwise exist.   Defendant VMware contends that section 2.0 conveyed to Auspex the right to sue for enforcement, and that this transfer is hidden within the language "all the ancillary rights."   (D.I. 46, VMware's Opening Brief in Support of its Motion to Dismiss for Lack of Jurisdiction Over the Subject Matter, at 16 *hereinafter* "VMWare's Opening Brief").   Notwithstanding the absence of express language in the agreement relating to the right to sue, this argument also fails when read in the context of *the rest of the sentence* upon which VMware relies:   "Pitts hereby grants Auspex…for sale, lease, license…the Product…**for use with Auspex products with all ancillary rights necessary to accomplish such sale or distribution [of Auspex products], and including the right to prepare or have prepared derivative works based on the product [relating to Sections 6.0-6.2 of the agreement]**."   (Ex. A).   Accordingly, the agreement conveyed only those "ancillary rights" that would allow Auspex

14

to effectuate sales of its products and further its own product technology; the language was intended to give Auspex the right to modify Pitts' intellectual property as necessary to fit each Auspex product customer for sales purposes only.  It did not convey the right to sue for patent infringement.  In fact, Pitts confirms that he did not provide Auspex with any right to enforce his patents.  (Pitts Decl. ¶ 17).

The case upon which VMware relies does not even support its contention that a right to sue can be transferred cryptically by invoking "ancillary rights" relating to specific product sales and specific product development of a single company.    (VMware Opening Brief, p. 16).  In *Propat Intern. Corp. v. Rpost, Inc.*, 473 F.3d 1187 (Fed. 2007), the agreement <u>expressly</u> gave the licensee "the responsibility to license the patent to third parties, to enforce the licensing agreements, and to sue infringers."  *Id*.at 1190.  VMware does not cite any authority to support its proposition that a transfer of "all substantial rights" in a patent, including the right to sue, can happen without this kind of <u>express</u> transfer of the right to sue for patent infringement.[5]

Moreover, another factor in determining whether patentee has transferred "all substantial rights" is whether the patentee expressly transferred his own right to practice the invention.  See, *Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, C.A. No. 07-255-JJF, 2008 U.S. Dist. LEXIS 98178 *7 (D. Del. Aug. 26, 2008) (Jordan, J.) (reservation of rights in transferor is sufficient to undermine assignee's claim of standing).  In the present case, the Agreement does not include any transfer of Pitts' right to practice his own invention, and the Agreement as a whole

---

[5] VMware contends that that the grant to Auspex of a royalty-free license makes the retained right-to-sue illusory (VMWare's Opening Brief at p. 16).  However, Auspex did not have an "unfettered" or "royalty-free" right to grant a license, as required by the cases cited by VMware. Instead, they only had a right to license for use with an Auspex product, and this limited field of use of Auspex products is not implicated by any of Plaintiff's allegations or Defendant's products in this case.

(particularly the sole grant of ownership in Sections 6.1-6.2) demonstrates that Pitts reserved this right for himself.

Likewise, Auspex's bankruptcy and SEC filings show that Auspex did not claim to have purchased "all substantial rights" in Pitts' IP.  Auspex's filing with the Bankruptcy Court listing twenty-eight (28) pages of "Software, Hardware Platform, Patents and Assignable Licenses" makes no reference to any interest in any of Pitts' patents even though Pitts' patents, including the '914 Patent, had issued by the time Auspex filed for bankruptcy.  Similarly, Auspex's SEC filing does not refer to any of Pitts' patents.  (Ex. F).

Further, after the effort to work together in 1994 failed, Pitts and Auspex went their separate ways, and at no point before, during or after the entry into the May 1994 agreement with Auspex, did anyone from Auspex ever advise Pitts that Auspex believed that it had any right or interest in any of his IP rights outside of the narrow field of use described in Section 2.0, "for use with Auspex products." (Pitts Decl, ¶ 17).

Consistent with Pitts' own belief and intent that he did not grant "all substantial rights" to Auspex, Pitts proceeded to assign his patent portfolio to NCT.   MOSAID derives its ownership of these patents from Twister, which purchased them from NCT.  (Ex. E).

There is no evidence that either Pitts or Auspex intended or believed that the 1994 agreement transferred "all of Pitts' substantial rights" in his IP.  VMware's contentions to the contrary are not supported by the express language of the agreement, the intentions of the parties, nor the applicable law.

Finally, as previously held by Judge Walker based on the plain language of the 2001 agreement, Inca only retained a license to Pitts' patents in the File System which "excludes the HTTP, FTP, TFTP and/or Gopher protocols."   (Cooper Decl., Ex. E, ¶ 3, p. 3).  In the present

16

case, Plaintiff contends that the accused products operate according to the HTTP protocol and other protocols that are outside the File System Field, as defined in this agreement. At the same time, VMware has not offered evidence that its infringing products are within the File System Field. Accordingly, VMware's motion should be denied.

### C.  Auspex, Inca and NetApp are Not Necessary Parties

For the purpose of Rule 12(b)(7), the Court accepts as true the factual allegations of the complaint. *See Jurimex Kommerz Transit G.M.B.H. v. Case Corp.,* 65 Fed. Appx. 803, 805 (3d Cir. 2003). A court, in evaluating such a motion, applies the two-part test set forth in Rule 19. The first part of this test asks whether the absent party is necessary for adjudication of the issue. The second part of the test is equitable in nature, and is directed to whether a necessary party is indispensable to a fair resolution of the issues. *Id.*

Rule 19(a) provides that an absent person is a necessary party if he is subject to service of process and either: (1) in his absence, complete relief cannot be accorded among the parties; or (2) the absent person claims an interest in the subject matter and that his absence will, as a practical matter, either prejudice his ability to protect that interest or result in multiple or otherwise inconsistent obligations. FED. R. CIV. P. 19(a).

If a person is deemed necessary under Rule 19(a)  but cannot be joined, the Court must ascertain the extent to which prejudice will result to the non-party; the ability of the court to shape relief to avoid prejudice to absent persons; the adequacy of relief available to parties in the necessary party's absence; and the adequate remedy available to the plaintiff if the action is dismissed for nonjoinder. FED. R. CIV. P. 19(b). Rule 19(b) only applies where a person should be made a party under Rule 19(a). *See Field v. Volkswagenwerk AG,* 626 F.2d 293, 300 (3d Cir.

1980).  Thus, if a party is not necessary under Rule 19(a), the Court need not conduct an analysis under Rule 19(b).

None of the three (3) parties identified by Defendant VMware has any of its respective interests implicated by the present lawsuit.  First, none of the three has claimed any interest in the subject matter of the suit – usage outside the narrow fields of Auspex products and outside the File System Field -- or sought to intervene in the present case.[6]  Second, the Court can afford complete relief in this case because none of Plaintiff's infringement contentions implicate any other parties' interests.  For example, Plaintiff does not contend that any Defendant's infringement arises from any Defendant's use of Auspex products or products within the File System Field.

This means that NetApp (which acquired Auspex's rights, such as they are) also has no interest in the present litigation.  NetApp, having acquired only the intellectual property detailed in a twenty-eight (28) page listing of Auspex's IP rights, cannot avoid the inconvenient truth that the list makes no mention of any interest in any Pitts' IP rights; accordingly, NetApp cannot and does not contend that it has any ownership rights or interest in Pitts' IP rights.  Moreover, VMware has put no evidence into the record to show that NetApp purchased any of Mr. Pitts' intellectual property rights.

The infringement allegations in the present case do not implicate the narrow fields of use which define the scope of the product licenses afforded to Auspex and Inca.  Accordingly, those entities have no interest in the present litigation and cannot be considered necessary parties.

---

[6] Plaintiff believes that Auspex ceased operations after the conclusion of its bankruptcy in 2003.

18

## V.    CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court deny Defendant VMware's

motion to dismiss for lack of standing and motion for joinder under Fed. R. Civ. P. 19.


January 19, 2012                                 BAYARD, P.A.

OF COUNSEL:                                      */s/ Stephen B. Brauerman*
                                                 Richard D. Kirk (rk0922)
Steven G. Hill                                   Stephen B. Brauerman (sb4952)
Douglas R. Kertscher                             222 Delaware Avenue, Suite 900
HILL, KERTSCHER & WHARTON, LLP                   P.O. Box 25130
3350 Riverwood Parkway, Suite 800                Wilmington, DE  19899
Atlanta, Georgia  30339                          rkirk@bayardlaw.com
770.953.0995                                     sbrauerman@bayardlaw.com
                                                 (302) 655-5000

                                                 *Attorneys for Plaintiff MOSAID*
                                                 *Technologies Inc.*